1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 9  GUSTAVO ADOLFO DUENAS, | Case No. 1:24-cv-00335-KES-SAB-HC |
| 10  Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| 11  v. | |
| 12  TRENT ALLEN, | |
| 13  Respondent. | |

14

15      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

16  pursuant to 28 U.S.C. § 2254.

17                                                    **I.**

18                                        **BACKGROUND**

19      On March 1, 2018, Petitioner was convicted after a jury trial in the Fresno County

20  Superior Court of two counts of second-degree murder. (2 CT[1] 506, 508.) On December 9, 2019,

21  Petitioner was sentenced to two consecutive terms of fifteen years to life. (17 RT[2] 4808.) On

22  October 7, 2022, the California Court of Appeal, Fifth Appellate District remanded to the

23  sentencing court to amend the abstract of judgment to reflect the correct custody credit and

24  affirmed the judgment in all other respects. People v. Duenas, No. F080481, 2022 WL 5434451,

25  at *20 (Cal. Ct. App. Oct. 7, 2022). On December 21, 2022, the California Supreme Court denied

26  the petition for review. (LDs[3] 30, 31.)

27  _____
[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on September 27, 2024. (ECF No. 21.)
[2] "RT" refers to the Reporter's Transcript on Appeal lodged Respondent on September 27, 2024. (ECF No. 21.)
28  [3] "LD" refers to the documents lodged by Respondent on September 27, 2024. (ECF No. 21.)

On March 20, 2024, Petitioner commenced the instant action by filing a petition for writ of habeas corpus. (ECF No. 1.) On August 9, 2024, Petitioner filed a third amended petition ("TAP") raising a sufficiency of the evidence claim. (ECF No. 13.) On October 8, 2024, Respondent filed an answer. (ECF No. 22.) To date, no traverse has been filed, and the time for doing so has passed.

**II.**

**STATEMENT OF FACTS[4]**

A jury acquitted defendant Gustavo Adolfo Duenas[5] of first degree murder for his role in the deaths of Calvin Lamar Reese and Jose Nunez Duenas on March 1, 2018, but convicted him of second degree murder as to both victims.

. . . .

**I. Prosecution evidence.**

**A. Law Enforcement Response to Apartments at East Balch and South Winery Avenues**

On December 6, 2014, Officers Miguel Archan and Michael Pierce, employed by the Fresno Police Department, were leaving a domestic disturbance call at the apartments located at East Balch and South Winery Avenues in Fresno (the corner), when they were dispatched back to the same location at 7:30 p.m. to respond to a shooting. When Archan received the call, the officers were a few blocks away in their vehicle, having cleared the domestic disturbance call at 7:28 p.m.

The officers responded to the earlier domestic disturbance call at 6:43 p.m. Duenas was standing on the balcony outside the apartment when they arrived and appeared to be under the influence but was not armed. Archan contacted Duenas's estranged wife and his son at the apartment.[6] At the conclusion of the call, defendant agreed to transport his father, Duenas, from the area. Archan followed behind Duenas and defendant when they left, but not see them enter any vehicle.

Upon returning to the area, Archan did not observe anyone running from the area. The officers saw a group of people near a victim in the middle of the street on East Balch Avenue. The officers were then advised of a second victim located behind some rocks. Archan responded to the victim in the middle of the street, later identified as 25-year-old Reese. Archan identified the area where he found

---

[4] The Court relies on the California Court of Appeal's October 7, 2022 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[5] We will refer to Gustavo Adolfo Duenas as defendant to avoid confusion with his father, victim Jose Nunez Duenas, whom we shall refer to by his surname.

[6] Archan testified that Maricella G. (Duenas's estranged wife), Duenas's son, and a young woman were in the apartment when he arrived, but he did know if defendant was the son. Defendant's mother, Maricella, testified that her son, Francisco, was at the apartment but did not include defendant when listing the individuals present during the call. However, she did testify that defendant escorted Duenas from the apartment.

Reese on East Balch Avenue, indicated on exhibit 1 by three circles labeled 11 through 13 as set forth below:



Archan testified that Reese's location was not illuminated by a streetlight and the lighting conditions were moderate to minimal. Reese was lying face down, his head pointing east, with blood coming out of his mouth. Archan heard Reese make a noise and thought Reese was trying to talk. Reese's shoes were near him on the street. Reese was unresponsive and, when Archan turned Reese over, Archan noticed that Reese had gunshot wounds to his shoulder and chest. Archan began CPR and continued until another officer and emergency medical services arrived.

Pierce stayed with the victim near the large rocks on the southeast side of the corner, later identified as Duenas, who was the subject of the domestic disturbance call. Duenas was lying face down, his head near the rocks and pointing southeast, and Pierce could see that Duenas had a hole in the back of his head that was bleeding. Pierce commenced CPR when he could not find Duenas's pulse. During that time, Pierce heard someone say, "Why did you shoot my dad?"

Archan estimated that the two victims were lying approximately 20 to 30 yards from each other. Ambulances transported both Reese and Duenas to a hospital. Reese was pronounced dead at 8:56 p.m. on December 6, 2014. Duenas had no brain activity and was on life support to preserve his organs for donation.

According to Reese's fiancé of five years, Shanika C., she and Reese shared an apartment near the corner, east of the intersection on the south side of East Balch Avenue. At approximately 7:30 p.m., on December 6, 2014, Reese left the apartment to walk to the store to purchase something to drink for dinner. The store was just a few minutes away, and Shanika expected Reese to be back after approximately five minutes.[7] Before Reese returned, Shanika heard two gunshots, and she went outside. Although her apartment was located on East Balch Avenue, she did not see anything and went back into her apartment to wait for Reese.

Upon observing police cars in the street, Shanika walked to the corner and saw a commotion and an older man (Duenas) lying on the ground. Shanika then noticed paramedics surrounding someone else in the street in the other direction. She saw that it was Reese, but officers prevented her from getting close to him. Later that evening, Shanika learned that Reese had died. Shanika spoke with police and initially thought Reese's wallet had been taken but, a week later, she found the wallet in Reese's sweatpants at the apartment.

**B. Crime Scene Investigation**

Sergeant Daniel Vandersluis and crime scene technicians responded to the corner to investigate, diagram and photograph the area, and collect evidence. During this time, no members of the public were permitted into the area and no vehicles were allowed to enter or leave. A diagram of the crime scene (exhibit 1, *ante*, p. 4) was prepared and reflects the buildings, the locations and license plates of vehicles parked on the street, and the locations of evidence stand numbers.

Evidence stands 4 through 10 were placed on the southeast side of the corner near the rocks where Duenas was found. Technicians recovered the casing from a nine-millimeter bullet near the curb, indicated by stand 4.

Evidence stands 6 through 9 were placed on an embankment on the corner and close to a puddle of blood near the area where Duenas's head had been lying. Technicians found a second nine-millimeter expended bullet casing, designated by stand 7, and made by the same manufacturer as the casing found at stand 4. The casings were found approximately three or four feet apart. No fingerprints were found on either casing. No additional casings, bullet strikes, or bullets were found during a later search of the crime scene.

Michael Appel, a senior criminalist with the Department of Justice, testified that he analyzed firearm and toolmark evidence and firearm ammunition components. He examined the two nine-millimeter casings and concluded that they were fired by the same weapon.

Technicians also found a tire jack handle near Duenas's blood, indicated by evidence stand 6, and recovered DNA but no fingerprints from it. Mindy Crow, another senior criminalist with the Department of Justice, identified Duenas's DNA on the handle.

Technicians recovered eyeglasses and folded currency from this area but were unable to recover any fingerprints from the money. Further away from the rock area, but on the same corner, technicians found a bullwhip, identified by evidence stand 10.

---

[7] Terry S. testified that the store was two blocks down Winery.

Evidence stands 11, 12, and 13 indicate the location of clothing items found at the scene in the area where Reese had been lying. Vandersluis observed blood, vomit, and clothing in this area. The clothing included athletic shoes, sweatpants, a cut T-shirt, a back brace, and a hat. The clothing had been torn or cut off and was soaked in blood.

Crow examined Reese's clothing to determine whether she could obtain DNA from someone other than Reese because she had been advised to search for saliva. She developed DNA profiles for Reese from a sample of his blood and profiles for defendant and [codefendant Jorge M.] Rodriguez from cells obtained from inside their mouths.

Crow examined Reese's sweatpants, shoes, black T-shirt, baseball cap, and plaid shirt. Due the presence of blood on the baseball cap, T-shirt, and plaid shirt, Crow was unable to obtain a DNA stain for comparison. Crow did obtain three DNA stains from Reese's shoes and four DNA stains from his sweatpants. Crow was able to exclude defendant and Rodriguez as contributing to one stain from the sweatpants, but due to the clarity of the other DNA stains, she was unable to conclusively interpret whose DNA was present.

Technicians photographed a white truck on South Winery Avenue, located just north of the apartment's main parking lot, and a broken glass bottle located near the truck, identified by evidence stands 1 through 3. Sergeant Adrian Alvarez, the Fresno Police Department lead detective on the case, testified he believed the truck was registered to Duenas. Technicians observed a tire jack, indicated by stand 14, behind the front seat and within the cab area of the truck. Vandersluis removed the tire jack because a tire jack handle had been found near Duenas's body. Detective Vandersluis testified that it appeared that the handle found near Duenas was a counterpart to the tire jack found in the white truck. The truck was towed from the crime scene.

Vandersluis also investigated the various lighting sources found throughout the crime scene and documented a total of 15 sources. The streets were illuminated with streetlights, which were all operational. The apartment buildings had attached lights at the door and patio areas, although the lights were under the occupants' control so Vandersluis did not know if they were illuminated during the murders. The only other light source was the apartment complex's sign located on the north side of the corner. The corner was fairly well lit. The area where Reese was found was not as well lit as the corner.

Alvarez testified that lighting was minimal, but he could see the street and the cars in the roadway and the lighting was sufficient to permit identification of individuals within 25 yards. As part of his duties, Alvarez requested that additional crime scene technicians respond to the crime scene and photograph the area during daylight hours. Additional photographs were taken specifically to obtain a view of the corner from the area where the white truck registered to Duenas had been parked during the crime.

Alvarez identified surveillance cameras attached to the apartments and determined that were not functioning. The manager of the apartment complex testified that they had been inoperative for several years.

Alvarez also testified that Rodriguez stated that he was parked in a vehicle behind the white truck at the time of the shooting.

**C. Shooting Witnesses**

*1. Miguel F.*

Miguel F. testified that on December 6, 2014, he was in the back seat of a vehicle with his brothers returning home after dinner. Miguel testified that they were traveling north on South Winery Avenue and then east on East Balch Avenue and identified the corner where the murders occurred in exhibit 1. He saw an African-American male (Reese) lying face down in the middle of the road on East Balch Avenue. Miguel checked on Reese and observed blood and a wound on Reese's chest. Reese spoke and told Miguel that he was cold. Miguel testified that Reese was coughing. After seeing that Reese was bleeding, Miguel called 911.

Miguel did not see a weapon near Reese and did not hear any gunshots. He did not see anyone else near Reese. Miguel did not know that there was a second victim until after the police arrived.

*2. Lucas E.*

Lucas E. testified that he lived with his brother and stepfather in a second-floor apartment at 540 South Winery Avenue, on the corner, and identified the location in exhibit 1. Lucas was sitting on the couch in the living room when he heard the first shot on the night of the murders. He heard a second gunshot two or three seconds later and went out to the balcony through the sliding glass door. He only heard the two shots. The couch was next to the balcony door, which was already open, and he was outside within five seconds. The balcony's view was straight to the corner.

From the balcony, Lucas saw one man running and then just drop (Reese) and a man chasing Reese. The man was in his early twenties, thin, bald, and wearing a red shirt. Lucas testified that he looked like he had shaved his head. The man stood over Reese, looked at him, kicked him, spat on him, and called him "a bitch ass nigga." Lucas viewed the man from an angle and could clearly see he was holding a gun in his hand.

Lucas knew that the man spat on Reese because of the manner in which the man's head moved and the noise that resulted. Lucas knew the man kicked Reese because he saw the man kick at Reese's body.

Lucas noticed a second man standing on the sidewalk but, because the man stood outside of the light, Lucas could not see him very well. Lucas could see part of the man's body and that allowed him to conclude the individual was a man. The second man stood the whole time and did not appear to pay attention to anyone other than the first man holding the gun and Reese.

Lucas testified that the second man asked, "[D]id you get him?" The first man responded, "[Y]eah, let's go." The second man on the sidewalk left first, followed by the first man who had been standing in the street by Reese, and they both ran close together in the same direction. The two men ran down South Winery Avenue with space between them but not too far apart.

Lucas did not see Reese move at any point. After he lost sight of the two men, Lucas saw a few cars drive around Reese before seeing one stop; someone got out and used their cell phone to call 911 for help. Lucas continued to watch as the police and ambulances arrived. He never saw anyone take anything from Reese.

Lucas did not see anyone else in the area besides Reese and the two men until after the two men ran away. Lucas later learned that a second individual had been shot on the corner, but he did not see that individual.

Using a diagram of the area, Lucas identified where Reese and the two men were located when Lucas first saw them and the path they used to leave. According to Lucas, Reese fell in the street at the corner. Defense counsel showed Lucas the location where Reese's body had been found on the diagram, but Lucas believed the body was closer to the corner.

Alvarez identified Lucas as a witness on December 11, 2014, after visiting every apartment that faced East Balch and South Winery Avenues. Lucas appeared reluctant to speak with Alvarez but agreed to speak with Alvarez inside Lucas's apartment.

### 3. Terry S.

Terry S. testified that he lived in apartment 103 at 4941 East Balch Avenue, as indicated in exhibit 1. While sitting on his couch, Terry heard two gunshots back to back, got up, went outside, and ran to the corner. Terry thought he heard a third shot as he was going outside. Terry saw an African-American man lying in the middle of East Balch Avenue and two people running away. According to Terry, the two individuals were both male, but he could not describe them further. The man closest to Reese walked backwards and then turned and ran. He appeared to be light-skinned and had his right arm extended as if pointing, although Terry did not see if he had anything in his hands. The second man ran toward the gate between 520 and 540 South Winery Avenue, and the first man ran toward the parking lot just north of the gateway. Terry could not see the second man very well but thought he appeared bigger than the first man. Terry did not see the two men running together, they ran in different directions.

Terry testified that the police arrived approximately 10 minutes later. Someone turned Reese over to see if he was alive, but Reese did not move, and Terry believed that Reese was dead. Cars drove by and some stopped to avoid hitting Reese. Terry did not see anyone take anything either from or around Reese. Terry's sister came from the corner and told him that another individual had been shot and was lying by the rocks at the corner.

Alvarez testified that when he interviewed Terry, Terry described the direction the suspects ran differently than when he testified. During his testimony, Terry indicated that one suspect ran north from the corner and the other individual ran between the buildings on South Winery Avenue. When Alvarez interviewed Terry the day after the murder, Terry indicated that one of the suspects ran from the area of Reese's body westward through the pedestrian gate between the buildings on South Winery Avenue and the other suspect ran west and down South Winery Avenue.

## D. Additional Investigation

### 1. Defendant's Text Messages from December 6, 2014

Alvarez obtained a phone from defendant on the evening of the murders. Alvarez provided the phone to James Lutter, a digital forensic analyst, and asked him to extract its contents. Lutter searched the phone for text messages, photographed the messages, and provided them to Alvarez.

On December 6, 2014, Defendant communicated with an individual identified as Marcos as follows:[8]

"[1:32 p.m.] incoming: Lagger.

"[1:33 p.m.] outgoing: Who ths

"[1:34 p.m.] incoming: Marcos

"[1:35 p.m.] outgoing: Today we could hit the jewelry store wasup u down

"[1:37 p.m.] incoming: Yeaa. Who else

"[1:39 p.m.] outgoing: I got some one

"[1:40 p.m.] incoming: Im not that down to just ask fo one and dipp id rather do a smash and grab

"[1:41 p.m.] outgoing: Grab a lot

"[1:43 p.m.] outgoing: Wats tp lets do ths rite now

"[1:45 p.m.] incoming: Yeah cus if I ask ima be all nervous. Id rather be in and out. [¶] Donex gonna do it wit me

"[1:45 p.m.] outgoing: Smoker George

"[1:46 p.m.] incoming: LOL

"[1:46 p.m.] incoming: Id rather do it.wit the bird

"[1:48 p.m.] outgoing: Wel I gota see wats gewd

"[1:50 p.m.] incoming: Or ima hit gio up rn

"[2:00 p.m.] outgoing: K

"[2:32 p.m.] outgoing: Were u at

"[2:39 p.m.] incoming: Ashos. That nigga gio said it's a berner

"[2:42 p.m.] outgoing: I done it m got cash out I do it again

"[2:46 p.m.] incoming: Find stupid people to rob like last time im sure iknow a few

"[2:47 p.m.] outgoing: Wasgewd line them up

"[2:48 p.m.] incoming: Fashoo then

"[3:01 p.m.] incoming: Well find something out to come swoop yur paddd

---

[8] Alvarez prepared a summary chart of the text messages and their timestamps, reviewed the phone's records, and determined the timestamps are consistent with the phone records.

"[3:02 p.m.] outgoing: Yea

"[3:03 p.m.] incoming: Imight stay the nite anyways

"[3:04 p.m.] outgoing: Were

"[3:06 p.m.] incoming: At yur paddd"

The text message thread continued into December 7, 2014, and Marcos texted that he knew an individual that they could rob.

The prosecutor introduced defendant's phone records. The records do not contain text content but do indicate the originating phone number for text messages and the times the messages were sent or received. The records for phone calls indicate the incoming and outgoing phone numbers, along with the times the calls were made or received.

### 2. Gunshot Residue

Technician Matthew Shafer, employed by the Fresno Police Department, acquired samples from defendant's hands the evening of the murders in order to test for gunshot residue (GSR). Using disks with a special adhesive, Shafer dabbed one disk along defendant's right hand along the index finger, web of the thumb, and thumb and then used the second disk to do the same on defendant's left hand. Department of Justice Senior Criminalist Berklee Akutagawa examined the disks to search for GSR.

Akutagawa testified that microscopic particles originate from the primer when a firearm is fired. The primer ignites, causing the gunpowder to burn, creating pressure in the cartridge case that causes the bullet to fly out of the cartridge. The bullet flies out in the primer, which has small metallic microscopic particles that travel in the vicinity of where the firearm is discharged. Akutagawa can detect these particles with an electron microscope. She then attempts to detect single particles that contain lead, barium, and antimony.

Akutagawa examined the samples collected from defendant's hands. As to defendant's right hand, Akutagawa testified that she found three particles in the sample that contained two of the three elements she sought, but since both particles are commonly found in the environment, she could not conclude that the particles were GSR, only that they were consistent with GSR. Defendant's left-hand sample contained three particles consistent with GSR and seven particles that contained all three elements and indicated the presence of GSR. Additionally, three or more particles of GSR indicate that the GSR was not caused by incidental contact such as might occur during transportation in a patrol vehicle. While seven particles constitute a "fairly high level," the presence of GSR cannot be used to conclude whether an individual fired a gun or stood near while the gun was fired.

When a firearm is discharged, GSR gets thrown out in the vicinity of the discharge. GSR mainly travels downstream but it can also go behind the shooter or next to the shooter, and GSR can settle on potentially anyone near the discharge. An individual may acquire GSR by handling a firearm that was recently fired, handling a firearm that was previously fired and not cleaned, or by touching a gunshot victim or surface that had quite a bit of particles. While GSR has been found on people 50 feet from the discharge, numerous variables prevent predicting when GSR will be found and the manner in which GSR was placed on

a person or object. GSR particles, similar to many other natural substances, can fall off one's hands through regular activities such as handling paper, touching doorknobs, or putting one's hands into one's pockets.

### 3. Defendant and Rodriguez's Physical Appearance on December 6, 2014

The prosecutor introduced into evidence the photograph of Rodriguez that had been taken when he was arrested by the Fresno Police Department on November 13, 2014, three weeks before the murder, and showed the length of Rodriguez's hair on that date. The photograph showed that Rodriguez's hair was closely shaven.

The prosecutor also introduced photographs of defendant taken on December 6, 2014, after the murders. The photographs accurately depicted the length of defendant's hair and his physique on that day.

### 4. Coroner's Findings

#### a) Calvin Lamar Reese

Dr. Michael Chambliss, a forensic pathologist, performed the autopsy on Reese's body. He first X-rayed Reese's body and determined that no bullets remained inside. Chambliss identified an entrance gunshot wound in Reese's right clavicle, though it had been cut into during the surgical efforts to resuscitate Reese. Chambliss observed the exit wound on Reese's outer left arm. He also examined Reese's plaid shirt and detected tears in the shirt that correspond to the entrance and exit wounds.

During his internal examination of Reese, Chambliss determined that the bullet entered Reese's right shoulder at the right clavicle approximately 63¼ inches up from his right heel and three and one-quarter inches right of his midline. The bullet exited through Reese's upper left arm, approximately 61¼ inches from his left heel and 10 inches left of his midline. The bullet started from the right side, moved left and slightly front to back, downward two inches, and exited his left arm. As the bullet moved through Reese's body, it passed through an area where one major branch of the aorta on the right side splits into one major carotid artery, up into the neck and subclavian artery, and then through the left common carotid artery before exiting.

The bullet entered Reese's body approximately two inches higher than it exited, that is, at a downward angle. However, this discrepancy could also be caused by rigor mortis, which affects accuracy in measuring the body, or because the bullet deflected through the muscle. Chambliss's observations only established that the bullet passed through Reese in a downward position and could not be used to determine the positioning of the firearm that fired the bullet.

Chambliss testified that he did not see powder tattooing around the entrance wound, which indicated the bullet was fired from a distance of more than 36 inches. An individual's clothing can also filter the gunpowder and prevent its appearance on the skin. Chambliss did not see any blackening on Reese's clothing around the bullet holes, although the color of Reese's shirt and the amount of blood prevented Chambliss being sure that the clothing was free of gunpowder. He concluded that the absence of GSR indicated the gun was fired from a distance

of more than 36 inches, but he could not absolutely make that conclusion in light of the limitations of his examination.

Chambliss also observed abrasions on Reese's face, left knee, and right hand. Reese had abrasions near his hairline, the outer corner of his left eyebrow, his left cheek, the left corner of his mouth, and his chin. These abrasions, as well as the abrasion on Reese's left knee, were consistent with falling on the pavement. Another abrasion was located on top of the pinky finger of his right hand.

Chambliss concluded that Reese died due to injuries to the thoracic aorta caused by a gunshot wound to the right shoulder and the manner of death was homicide.

### b) Jose Nunez Duenas

Dr. Venu Gopal, chief forensic pathologist at the Fresno County Coroner's Office, performed the autopsy on Duenas's body. During an external examination of Duenas, Gopal observed a gunshot entrance wound in the hairline on the back of Duenas's head behind the left ear, approximately $63^1/_2$ inches up from the left heel and two and one-half inches from the midline of his head. The bullet exited through the right side of Duenas's face, approximately 64 inches from the heel and two and one-half inches from the midline of his head. Because the distance of both wounds from the heel was almost the same, Gopal concluded that the bullet traveled horizontally and slightly left to right through Duenas's head.[9] The bullet was at least a medium caliber, either .380 or nine-millimeter, or larger.

Gopal's internal examination revealed that the bullet, upon entering Duenas's head, traveled through the back of his skull, then through the left lobe of the cerebellum and brainstem, through the right maxillary bone, and exited through the right side of Duenas's face. A person who suffers this type of injury can collapse and die rapidly.

Gopal testified that the entrance wound did not exhibit any blackening or powder tattooing from GSR. The lack of stippling indicated that the muzzle of the gun was more than 30 to 36 inches from the surface of the skin when fired.

Gopal concluded that Duenas was killed by the perforation of his brain due to a gunshot wound to his head and classified it as a homicide.

### E. Defendant's Statements

#### 1. Defendant's December 7, 2014 Statement

Alvarez was the lead detective investigating Reese and Duenas's murders. He interviewed defendant at approximately 1:28 a.m. on December 7, 2014. The video recording of defendant's first interview with detectives was played for the jury.

During the interview, defendant told the detectives that he was 19 years old and lived with his mother at 540 South Winery, Apartment 205. Defendant said that

---

[9] Gopal explained that his examination only described the bullet's path with reference to the anatomy of Duenas's body.

he had his own cellphone and he had provided it to them but claimed that he could only use it to send text messages.[10]

Defendant stated that he was home with his mother that day. When Duenas arrived and started arguing with defendant's mother, they called the police. The police escorted Duenas from the property, and Duenas called defendant to obtain a ride home because Duenas did not have a license. Defendant agreed and met Duenas at the truck. Duenas got into the truck with the keys.

At the same time, Reese walked by the truck "minding his own business," and Duenas looked at Reese.[11] Reese asked, "What Motherfucker?" Duenas told defendant that he left something in the apartment, "his drink or something," and that he would be right back. Defendant looked out of the truck's window and saw that Reese continued to look at them, and then Reese said, "What motherfucker you want something?" Defendant then heard something that sounded like "chk-chk" and became scared that they would be shot. Defendant saw that Duenas was crossing the street toward Reese and, as he got out of the truck, he heard gunshots and ran to Duenas who was lying on the ground. Defendant also saw Reese fall instantly. Defendant heard two different types of gunshots. He ran into his house and told his mother what happened. His family came out and they determined that someone had already called the police because the police came.

Defendant reiterated that the first thing Reese said to them was, "What ya'll lookin' at motherfucker?" Defendant was in the driver's seat of the truck at that time and Duenas had not yet entered the truck but had the keys. After Reese walked by, Duenas closed the door and left. Defendant did not see that Duenas had anything in his hands and watched him cross the street through the rearview mirror. Defendant drew a diagram to explain that the truck was parked near the apartment complex's entrance and facing south on South Winery Avenue.

Defendant explained again that Duenas was on the sidewalk when Reese passed by them. Reese said, "What? What ya'll—what ya'll lookin' at motherfuckas?" Once Reese passed them, he walked into the street and asked, "What's up?" Defendant said, "I don't want no problems, man." Then Reese ducked behind a red truck. Reese said, "Try something stupid motherfucker," and defendant heard the sound of a firearm racking. Defendant thought Reese intended to shoot him and closed the window. Then Reese walked off.

At that same time, Duenas closed the door to the truck and said he would be back. Defendant "was, like, 'Hey, nah, come on let's go.' And then ... [Duenas] goes, he comes back and he just goes '((Spanish Spoken))' " and left. Defendant saw Duenas cross the street at the corner where Reese had walked when defendant looked in the rearview mirror. Defendant yelled, "Papa ... stop" or "Papa, no." However, Duenas was hard-headed and did not listen. Duenas was wearing his white sombrero and "looked like he was prepared." Defendant got out of the car and heard three gunshots, two that sounded the same and another one that sounded louder. As defendant ran to the corner, he saw Duenas lying on the ground. Defendant also saw Reese running, gasp for air, and fall. Defendant did not understand how both men got shot. Defendant said that he then saw "some

---

[10] Contrary to defendant's claim, records for his phone indicate that it was used to make and receive telephone calls both before and after the murders.

[11] Defendant stated later in the interview that when Reese talked to them, "he didn't only tell us something. He told other people on the other side, too. Like, this—I think this black guy was mad or something." However, defendant never discussed any other individuals being present on the street during his encounter with Reese.

Mexican guy" running, as defendant informed the officers at the scene, and the officers also saw the man running by a nearby store.

Defendant explained that Duenas had problems with defendant's mother, and he used methamphetamine. Duenas sometimes saw things and defendant could not calm Duenas down. Defendant also believed that Duenas was still angry about the fight with defendant's mother and reacted badly to Reese.

Defendant told the detectives that another woman claimed to have seen two men wearing hoodies running away and that he told officers, but the officers were paying attention to Duenas. A detective asked defendant if he was standing outside for a long time before the police arrived and defendant replied, "No, um, I went inside. That's where they have—that's where they took us out the house and everything because they said that I'm a—I'm a wit—, uh, witness."

Defendant said that Duenas did not "play with no weapons" and that defendant regularly searched Duenas's belongings for drugs and never found any guns. Defendant denied that Duenas owned a whip. Defendant denied owning any weapons or guns and said that no guns were in the apartment.

Defendant also told the detectives that he believed someone living in an upstairs apartment on the corner saw the shootings. However, defendant was alone when he found Duenas. The detectives questioned defendant as to how he failed to see the person that shot Reese and Duenas. While discussing how Duenas could have been shot by Reese, defendant asked the detectives where Duenas was shot. Defendant stated that he was telling the truth. The detectives told defendant that they did not locate any firearms at the murder scene, and defendant denied that he had taken any firearms from the scene. Defendant did not see any guns near Duenas.

Defendant claimed that he loved Duenas and that he would tell the police who was responsible even if the person was a family member or a friend and it meant being a snitch.

### *2. Defendant's December 21, 2014 Statement*

Alvarez interviewed defendant again on December 21, 2014, at 3:59 p.m., after defendant was arrested for murder. The second interview was introduced into evidence and played for the jury. Defendant agreed to speak to the detectives and told them he had previously told them the truth as to what had happened. The detectives provided a photograph of Marcos, the individual they believed text messaged defendant concerning committing a robbery on December 6, 2014. Defendant claimed that he did not know the individual in the photograph.

The detectives read defendant the text message from defendant's phone that discussed committing a robbery, but defendant denied that the messages had anything to do with Duenas's murder. Defendant explained that he was poor and needed money and, though they thought about committing a robbery, it did not happen because Duenas was killed. Defendant also claimed, "I thought I was gonna go do some robbing man. I wasn't gonna rob no one with no gun or nothing but just snatch and run you know?" Defendant claimed that what happened to Duenas had no relation to his plans to commit robbery. Defendant claimed that he was down the street when Duenas was shot.

When asked who else was present during the murders, defendant replied, "Myself. It was me and my dad. It was just me and my dad. My dad man." The detectives told defendant that a number of witnesses told them that defendant was not alone. The detectives urged defendant to identify the individual who shot Reese and Duenas. The detectives reviewed the evidence: "There was whip out there. There was a crowbar out there. Then it was you. Not that—how did the crowbar get there? From your truck. Your truck has the jack and the little thing that—that cranks the tire up. And it's no longer in your truck. It's right there next to [Duenas]'s blood. And I know [Duenas] didn't run up there with a whip and a crowbar.... That's—that's two people that walked over there with your dad. Or [Duenas] grabbed the whip and you had the crowbar. Or your buddy had the crowbar and you had the gun."

After several exhortations by the detectives to tell what happened, defendant asked, "Who—who was—you guys gotta let me know something though first man. I don't wanna go to jail man." The detective asked, "Who was the homie that was with you?" Defendant replied, "His name's Jorge. [¶] Rodriguez." Defendant did not know what kind of gun Rodriguez carried. Defendant then explained, "We was gonna take off man. And this black guy comes. [Reese]—he comes on the side of us and he—he—man he barely looked at us and we looked at him and told us, 'Wassup n—?' He told us—he told you you know what I mean? He told us like he confronted us." Reese then walked behind a red truck across the street, looked at them and said, "I swear to you man I could hear that shit Glock. His gun Glocked [racked] and shit. He goes, 'Try something stupid.'" Defendant was going to get out of the truck but got scared and sat back in the truck. Rodriguez was outside of the truck when Reese went by them, but after Reese went behind the red truck, defendant did not see him anymore. However, Reese continued to walk down the street. Defendant was still in the truck and saw Duenas cross the street toward Reese, and he shouted, "No dad." Defendant heard the three gunshots "by the time I was gonna get out the car," ran from the truck, and "when I got there man I just seen [Reese] on the ground too and everything man."

Defendant told the detectives that he did not see Rodriguez at that time and Rodriguez was gone. The detectives challenged defendant's version of events and accused defendant of knowing that Rodriguez shot the victims. Defendant denied having seen the shooting and claimed that he did not know if Rodriguez was responsible. The detective asked, "Who said—who said, 'Let's—let's go get that nigga?' Who said that? 'Cause I got a witness who heard you say that. Who said it? Was it you or him?" Defendant replied, "It was probably him. It wasn't me." Defendant tried to explain, "Just my dad though man." "You know what I mean? I'm not gonna just you know what I mean? I had to run to my dad man. You know? I'm—I woulda gave my life up for my dad man."

Defendant explained that he did not want to say anything about Rodriguez because he did not want to "snitch on him" and did not "know if [Rodriguez] did anything bad.... I [don't] know if he shot anybody." When asked about the crowbar found at the scene, defendant replied, "Probably my dad had got it man." The detective pointed out that it had been behind defendant's seat in the truck, but defendant claimed not to know how Duenas got the crowbar and suggested that it may have been in the back of the truck. The detectives asked about the bullwhip and defendant replied, "The whip? I don't know. That's my dad's whip." Defendant explained that he had previously prevented a fight that Duenas tried to start because Duenas was "crazy" and "[s]ick in the head."

14

Defendant explained again that after the police escorted Duenas from the apartment, "I went to the truck and I was gonna give him a ride.... And then I went to the truck and I got in and my dad was still outside. I was like, 'Come on. Let's go.' And my dad's a hard headed man. I told him like three times ((Spanish Spoken)). He didn't listen to me. And that's when that black guy comes." Defendant continued, "That's when the shit starts happening like, you know, he starts telling the—telling he probably all—for what I know he probably told my dad shit. My dad didn't understand him. So what I'm thinking that black guy went around the truck and that's when I heard him telling, 'Try something stupid motherfucker.' And he Glocked it. And you could hear where the gun is. You know what I mean? You could hear a gun, you know? You know how a gun sounds." "So when he did that I was like, 'Oh shit.' You know? Now I got—I got scared, you know what I mean? 'Cause I didn't have a gun or nothin' like that, you know? And—and then it—that's when he just like took off and went walking. And I'm guessing my dad went like that." "He probably tried to protect me or something, you know?" Defendant said that Rodriguez was gone when everything happened.

Defendant explained that he did not tell the detectives originally that Rodriguez was present because "I was focused on my dad man. I was focused on tryin' to save his life man. But I couldn't save his life. I didn't save his life. Someone else. I don't know who the hell. It coulda been Rodriguez." The detectives mentioned that witnesses saw one of the suspects run through the gate to the apartments and defendant admitted that he ran through that gate. Defendant responded, "But I wasn't—I was right there with my dad, you know? I was just like, you know, tryin' to wake him up," and claimed that he was not paying attention to what Rodriguez may have been doing to Reese. Defendant said that he was "at the corner on my knees right there where [Duenas] was at."

Defendant explained that Rodriguez never went into his apartment but had been hanging around for two hours. They were about to leave with Duenas when everything happened. Defendant described Rodriguez as his height and having a little bit of hair growing just as short as defendant's hair.[12] The detective questioned defendant as to whether he saw Rodriguez spit on and kick Reese, but defendant denied that he saw that. When the detective asked, "Who was your friend that was there with you at the corner?" defendant replied, "[Rodriguez]. It was him. Pretty much sure that it was him." Defendant clarified that he was "pretty sure" it was Rodriguez, but he was not sure. The detectives did not understand how defendant could not be sure given his familiarity with Rodriguez's appearance and asked, "Was it [Rodriguez] or not?" Defendant replied, "Yeah."

Defendant told the detectives that he did not say anything to Rodriguez after he saw Duenas and that he was "right there with [his] dad." When asked what he thought when he saw Rodriguez fire the gun, defendant replied, "Probably he did it," and then said, "[A]ll I can tell you right now man is I heard the gunshots man but I didn't see nobody getting hit or nothing. When I ran there I seen my dad on the ground man. That's it."

---

[12] The prosecutor introduced photographs of defendant on the night of the murders, which showed his hair to be longer than Rodriguez's hair, and at the time of the second interview, showing defendant's hair to be closely cropped. The prosecutor argued that Lucas's description of the individual with the gun who stood over Reese matched Rodriguez rather than defendant as Rodriguez was thinner and had cropped hair that could have been mistaken for being bald (as shown in an arrest photograph three weeks before the murder).

Defendant admitted that the first time he spoke with the detectives he "just left out a couple of things." But he maintained that he was not sure who shot Reese and that he "freaked ... out" when Duenas was shot and was trying to see if Duenas had anything to tell him. Rodriguez was gone when defendant looked for him.

The detective asked defendant to tell him again who was present. At first defendant said, "Just me," but when challenged, defendant replied, "Just me and, um, you guys could say [Rodriguez]. [Rodriguez] ay." The detective replied that defendant had said that Rodriguez was present, and defendant agreed. The detective asked, "I asked you two weeks ago you said nobody. Today you're telling me it's [Rodriguez]. Are you being honest with me?" Defendant replied, "Yeah."

The detective asked if Rodriguez was at defendant's apartment complex because they intended to rob someone. Defendant replied, "He didn't come over. Nah. We seen him right there. He was comin' down the street ...." The detective reminded defendant that he had already told them that he intended to do a robbery with Rodriguez. Defendant agreed that was true and said, "We were plannin' to rob like a freakin,' you know? Like somebody, you know? You feelin' me? Or something. You know?" The detective pointed out that defendant's text messages at 2:46 p.m. on the day of the murders indicated that defendant intended to "[f]ind a nigga to rob" "[l]ike last time" and mentioned that Rodriguez would do it with him. Defendant responded, "Wasn't no plan to rob nobody right there.... I'm tellin' you what [Reese] did. He told—he confronted us." Defendant speculated that Duenas may have been trying to protect defendant.

Defendant said that he did not know whether Rodriguez carried a gun and Rodriguez probably hid the gun from him. He claimed, "I swear man. I don't know if he had a gun on him. I don't know if he had a gun on him. I wasn't tryin' to plan to rob no one with no gun. Nah. We were not gonna rob no—we were just gonna snatch. Do somethin' like that. But I don't know about no carry no firearms or nothin' like that."

The detectives continued to question defendant as to how he could be with Duenas, who lay on the ground, and not be aware of Rodriguez's actions in standing over Reese. Defendant replied, "Man I was cryin' right there with my dad man. I was cryin' there man. I was cryin' right there man." "I was right there. I was squeezin' my dad like this man." "Cryin' man. I was like that. Tryin' to wake him up man." "But he was gone man. Like you know what I mean?"

Defendant described his relationship with Rodriguez to the detectives. Defendant said that Rodriguez was not at the apartments until after he took Duenas to the truck, contradicting his earlier statement that Rodriguez had been there for approximately two hours. Defendant and Duenas were hanging out on a rock near the truck and Rodriguez came "out of nowhere." They "chill[ed] ... for a little bit" and then defendant tried to get Duenas into the truck to leave. Defendant explained that Reese walked by, everything happened, and "I just heard gun shots. I get out the car. I run over there. I seen my dad on the ground. I'm crying. I'm holding him. Squeezing him. I wasn't payin' attention to the bl—I just seen [Reese] ... fall." Defendant agreed that he saw Reese run from the sidewalk to the street where he fell to the ground. Defendant said that he first believed that Reese was going to shoot him but then saw Reese fall and again denied seeing Rodriguez, "I didn't see [Rodriguez]. I was just ... payin' attention to my dad man."

16

The detective asked defendant about a beanie found in the back of defendant's truck and explained that a witness described one of the suspects wearing a beanie. At first, defendant denied that he was wearing a beanie but eventually admitted the beanie was in his truck.

The detectives asked defendant how long he had been "chillin" with Rodriguez, and defendant claimed that he did not like Rodriguez and that seeing him on the day of the murders was a surprise. Rodriguez wanted to "chill" with him, and defendant discouraged Rodriguez because he was with Duenas. One of the detectives challenged defendant by telling him that the detective knew that defendant was involved but the detective just did not know whether defendant or Rodriguez fired the gun. Defendant replied, "Yeah I know that I'm involved man."

**F. Defendant's Escape**

On December 21, 2014, Officer David Ponek was tasked with transporting defendant from police headquarters to the jail. Ponek attempted to handcuff defendant in preparation for transport, but defendant recently broke his arm, and Ponek handcuffed defendant's hands in front to avoid further injury. Ponek escorted defendant to the transport vehicle that was parked close to the gate. When Ponek attempted to unlock the vehicle, defendant turned and ran away from police headquarters. Ponek was unable to catch defendant, broadcasted that defendant had escaped, and set up a perimeter. Defendant was later apprehended lying in a flower bed at a federal building nearby. Defendant struggled and pulled away from the officers but was taken into custody.

**II. Defense evidence.**

**A. Diane L.**

Diane L. lived with her mother-in-law in an apartment at 520 South Winery Avenue. The night of the murders, Diane heard gunshots and then a vehicle parked near her window drove off. She heard one man yell to another man before they drove off.

**B. Maricella G.**

Maricella G. is defendant's mother. On December 6, 2014, Maricella was decorating her home for Christmas with Francisco (her son), Sadae D., defendant's girlfriend, and defendant's baby. Duenas arrived and began arguing with her. He was wearing a white sombrero. The police were called, and they told Duenas to leave. Defendant agreed to drive Duenas from the area. At some point, defendant came back to tell her that Duenas had been injured, and defendant was scared. Maricella went to see what had happened. The family members went to the police station later in the evening.

**C. Ruben H.**

Ruben H. testified that he lived in the apartments on East Balch and South Winery Avenues. Ruben returned from taking his family to dinner and parked his white

truck on the street.[13] Ruben was on the sidewalk removing tools from his truck while his wife waited in the truck and his daughter sat on the grass. He saw a man wearing a hat cross the street and meet with another man at the corner. The men appeared to be hugging or greeting when he heard two or three gunshots. Ruben saw sparks three times in the area of the two men. He believed that the two men shot each other. The man wearing the hat fell to the ground.

After hearing the gunshots, Ruben placed his family in the truck and hid. He heard someone coming toward his truck and saw an African-American man fall to the ground before reaching the truck. He did not see anyone chasing the man but heard someone run by after the man fell. Ruben thought he heard someone say, "[R]un." Ruben grabbed his daughter from the front seat of his truck and ran with his wife into his apartment. Ruben also saw a person run along the apartments as he was leaving but could not identify the person because it was dark.

Ruben returned to his truck to close the door approximately two minutes later and did not see anyone near the two men who had been shot. Ruben later testified that when he returned to close his truck door, a car had stopped to help the man in the street. He never saw either of the men holding a gun.

Ruben initially told the police that he did not see anything but eventually agreed to meet with detectives and describe what he saw. The men were hugging when Ruben saw sparks, and he assumed they shot each other.

Duenas, 2022 WL 5434451, at *1–14 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

---

[13] Ruben had two trucks parked on the street that night, one white and one red. He was hiding behind the white truck. Based upon a review of photographs (exhibits 14, 15, & 109) and exhibit 1, Ruben was positioned behind the second truck east of where Reese fell.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 584 U.S. 122, 125 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has

1   denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

2   absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at

3   99. This presumption may be overcome by a showing "there is reason to think some other

4   explanation for the state court's decision is more likely." <u>Id.</u> at 99–100 (citing <u>Ylst v.</u>

5   <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

6       Where the state courts reach a decision on the merits but there is no reasoned decision, a

7   federal habeas court independently reviews the record to determine whether habeas corpus relief

8   is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853

9   (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

10  issue, but rather, the only method by which we can determine whether a silent state court

11  decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. While the federal court cannot

12  analyze just what the state court did when it issued a summary denial, the federal court must

13  review the state court record to determine whether there was any "reasonable basis for the state

14  court to deny relief." <u>Richter</u>, 562 U.S. at 98. This Court "must determine what arguments or

15  theories . . . could have supported, the state court's decision; and then it must ask whether it is

16  possible fairminded jurists could disagree that those arguments or theories are inconsistent with

17  the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 102.

18                                          **IV.**

19                                **REVIEW OF CLAIM**

20      In his sole claim for relief, Petitioner asserts that there was insufficient evidence to

21  support his convictions because "[n]o evidence was presented that a pre shooting plan existed to

22  rob or shoot anyone on that evening." (ECF No. 13 at 5.[14]) Petitioner argues that it was the jury's

23  duty to acquit because the circumstantial evidence was susceptible to two reasonable

24  interpretations, one which suggested guilt and the other innocence, and the jury did not follow

25  that instruction. (<u>Id.</u>) Respondent argues that the state court reasonably determined that the

26  evidence admitted at trial was sufficient to support Petitioner's convictions. (ECF No. 22 at 31.)

27

28  ───────────
    [14] Page numbers refer to the page numbers stamped at the top of the page.

This claim was raised on direct appeal to the California Court of Appeal, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 584 U.S. at 125.

In denying the sufficiency of the evidence claim, the California Court of Appeal stated:

**I. The evidence was sufficient to support the jury's verdict convicting defendant of second degree murder.**

In this case, the prosecutor's primary theory at trial was that defendant and Rodriguez attempted to rob Reese, Reese resisted, Duenas struggled with Reese, and Rodriguez shot at Reese, killing Reese and accidentally killing Duenas. As such, the prosecutor argued defendant was guilty of first degree felony murder. The jury was also instructed regarding second degree murder with malice aforethought (CALCRIM No. 520), aiding and abetting (CALCRIM No. 401), and transferred intent (CALCRIM No. 562).

In acquitting defendant of first degree murder, the jury implicitly failed to find that defendant engaged in an attempted robbery beyond a reasonable doubt. Defendant argues that the evidence was also insufficient to sustain his conviction for second degree murder under an aiding and abetting theory. We disagree.

**A. Standard of Review and Applicable Law**

Defendant challenges the sufficiency of the evidence supporting his convictions for second degree murder. "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be

convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358, fourth, fifth, sixth, tenth & twelfth bracketed insertions in original.)

A person who aids and abets the commission of a criminal offense is considered a principal in the crime. (§ 31.) "We have defined the required mental states and acts for aiding and abetting as: '(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Thompson* (2010) 49 Cal.4th 79, 116–117.)

" 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*Ibid.*) "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense. ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." [Citation.]' 'It has been held, therefore, that one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running, or to drive the "getaway" car and to give direct aid to others in making their escape from the scene of the crime, is a principal in the crime committed.' " (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743–744.)

## B. Analysis

Defendant does not dispute that the evidence was sufficient to prove that Rodriguez fired the bullets that killed Reese and Duenas with malice aforethought. The evidence was sufficient to support the conclusion that Rodriguez committed second degree murder by shooting Reese at a range close enough and " 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill.' " (*People v. Smith* (2005) 37 Cal.4th 733, 741.) The parties assumed that Duenas, being defendant's father, was not the intended victim but killed accidentally by a bullet intended for Reese. This argument finds support given the relationship of those involved and because the evidence demonstrates that both bullets entered the victims at approximately the same distance from their heels (roughly the same distance from the ground) while both men were struggling with each other. " 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' " (*People v. Bland* (2002) 28 Cal.4th 313, 320–321.)

Even if Rodriguez did not intend to kill Reese or Duenas, he intentionally fired a gun at them while they were struggling. "[I]mplied malice may be found when a

defendant, knowing that his or her conduct endangers life and acting with conscious disregard of the danger, commits an act the natural consequences of which are dangerous to life. [Citation.] Thus, to invoke a classic example, a person who fires a bullet through a window, not knowing or caring whether anyone is behind it, may be liable for homicide regardless of any intent to kill." (*People v. Roberts* (1992) 2 Cal.4th 271, 317; see, e.g., *People v. Chun* (2009) 45 Cal.4th 1172, 1205 [no juror could have found a defendant who participated in a shooting, either as a perpetrator or aider or aider, did not act with implied malice when shooting at a vehicle occupied by three people and gunshots fired at close range; such an act was dangerous to life and performed knowing of the danger and with conscious disregard for life], superseded by statute as stated in *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–249.)

Addressing defendant's culpability for aiding and abetting the shootings committed by Rodriguez, no particular factor is dispositive in establishing knowledge and intent; the court must look at the totality of the circumstances and not on " ' " 'isolated bits of evidence.' " ' " (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Here, there was substantial evidence at trial to support the inference that defendant knowingly and intentionally aided and abetted Rodriguez in murder considering defendant's presence at the scene of the crime, his companionship with Rodriguez, and his conduct before and after the offense. (See *People v. Nguyen, supra,* 61 Cal.4th at p. 1054.) Although an individual's mere presence at a crime scene or that person's failure to prevent a crime is not sufficient to prove guilt, such factors may be considered, together with other evidence, in the determination as to a defendant's guilt or innocence. (*People v. Durham* (1969) 70 Cal.2d 171, 181; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.)

Lucas, less than five seconds after the shooting, saw Reese run from the corner while being chased by a man with a gun. Lucas testified that the man carrying a gun chased Reese and stood over him, kicked him, spat on him, and called him "a bitch ass nigga." Similarly, Lucas testified that he saw a second man on the sidewalk who asked the man with the gun, "[D]id you get him?" The man with the gun replied, "[Y]eah, let's go."

A jury reasonably could have inferred from this statement that the second man was aware that Rodriguez intended to shoot Reese because he neither expressed surprise or disapproval of the shooting. The question, "[D]id you get him?" also expresses a shared intent and interest in the outcome as well as encouragement in the result to "get him." Given that Rodriguez was ending Reese's life and Duenas lay dying, it is not a reasonable inference that the man uttering the question, "[D]id you get him?" was merely expressing detached curiosity. Furthermore, Rodriguez's response of, "[Y]eah, let's go," also evidences a concert of action between the two men.

Substantial evidence supports the jury's conclusion that defendant was the man that stood by as Rodriguez shot Reese and Duenas, ascertained whether their objective was complete, and then ran off with Rodriguez. The evidence supports a conclusion that defendant was at the corner during the shooting and not down the street near his truck as he claimed to detectives. Defendant's own initial statement establishes that he was at the corner when Duenas and Reese were shot. Defendant told police during his first interview that he saw Duenas lying next to the corner and "then, uh, after that I just seen—I seen the other guy just running right here, like, like, swear to God, like, I just seen him gaspin' for air, you know?

And he just falls." Defendant even said that he first believed that Reese was going to shoot him.

The jury could reasonably have inferred that, given the specificity of defendant's description, he did see Reese run and fall to the ground after the shooting. However, Lucas and Ruben described these events as happening seconds after the shooting. Defendant would not have had time to run from his truck, down the street, and to the corner to observe Reese gasping for air and falling to the ground. Defendant also told police that he was near Duenas when he saw Reese fall. Therefore, defendant must have been present near the corner during the shooting.

Defendant repeatedly denied having seen the individual who shot Duenas and Reese during both interviews with detectives. During his first interview, defendant claimed he and Duenas were the only other individuals present with Reese but then claimed to have seen "some Mexican guy" running. During his second interview, defendant admitted that Rodriguez had been standing with them when Reese approached but claimed that he did not see Rodriguez after the initial encounter with Reese.

Based on the evidence, the jury could reasonably have inferred that defendant lied about knowing who shot Reese and Duenas. As we have discussed, Lucas described Reese being chased by someone with a gun less than five seconds after the shooting. Lucas heard the man with the gun call him "a bitch ass nigga." Having admitted to seeing Reese run from the corner and fall in the street, defendant should have heard these statements if Lucas was able to hear them from twice the distance away. Defendant admitted that he was present near the corner, and Lucas did not see anyone else leaving the area, though he watched the events until the ambulances took the victims from the scene.[15] Therefore, defendant must have been the man that Lucas saw on the sidewalk who asked the man with the gun, "[D]id you get him?" Defendant was also the man who left with the armed man when the armed man replied, "[Y]eah, let's go."

Additionally, defendant had GSR on his left hand and particles consistent with GSR on his right hand. Akutagawa testified that one acquires GSR by being in proximity of a gun when fired or handling a gun after it has been fired, either immediately or sometime thereafter if the gun has not been cleaned. The evidence in this case demonstrates that it is unlikely that defendant handled the gun after the shooting as no witness saw Rodriguez give the gun to defendant as they ran from the scene. Additionally, a witness saw defendant enter the pedestrian gate and saw Rodriguez continue to run down South Winery Avenue. Defendant admitted that he went through this gate to notify family members. It is also unlikely that defendant would take the gun from Rodriguez because he would have had to explain his possession of it to family members. The jury could reasonably have inferred that defendant acquired GSR either because he handled the gun before the shooting (GSR remaining on the gun from having been fired at an earlier time) and knew Rodriguez was armed, or was near Rodriguez at the time of the shooting and knew Rodriguez had shot the two men.

The evidence also demonstrates that Rodriguez and defendant were companions. Defendant admitted that Rodriguez had been at the apartment complex for approximately two hours before they prepared to leave with Duenas, although

---

[15] Ruben testified that he saw Reese running and heard a second individual running. He also believed that two people left the scene because he saw a different individual running near the apartments and heard someone say, "[R]un."

defendant also tried to claim that Rodriguez happened by just before Reese arrived. The evidence also indicates that defendant and Rodriguez intended to act in concert and support each other in criminal activity that evening. In addition to being in Rodriguez's company before the murders, defendant admitted that he did intend to commit robbery as described in the text messages identified by the detective. He also admitted that he had named Rodriguez as the individual to accompany him during those crimes in the text messages. Defendant told detectives that he and Rodriguez were leaving for that purpose when Reese walked by them. While defendant claimed that they were not attempting to rob Reese, the jury could reasonably have inferred that defendant lied about Rodriguez's presence during the first interview to hide Rodriguez's involvement in the murders, which would also implicate defendant given their intent to commit robbery.

Defendant's behavior after the shooting also supports an inference that he attempted to delay reporting the incident to the police. Duenas had just been shot. Defendant told officers that he saw Duenas lying on the corner, and the evidence shows that he left Duenas alone rather than calling his family or seeking assistance by calling 911. Defendant had a cellphone that he later turned over to the police. One normally would take their cellphone with them if leaving for the evening, and defendant's phone records show the phone was used to make outgoing calls at both 7:12 p.m. and 7:29 p.m. the evening of the murders. No evidence was introduced as to the identity of the numbers called, but defendant did not call 911. Defendant told officers that only the text message function of the phone was operational, but this statement is contradicted by defendant's phone records, which show both texts and calls between December 5 and 7, 2014.

Because police had seen defendant in the company of Duenas minutes before the shooting as he left to drive Duenas from the location, defendant could not conceal that he was present during the time of the shooting. By leaving the scene of the shooting rather than calling 911 immediately, defendant gave Rodriguez time to flee and provided at least a brief opportunity for them to coordinate their responses.

As we discussed, defendant claimed that he was at the truck when the shootings occurred and, when he reached the corner, he was too preoccupied with Duenas to observe the shooter. He said, "I was focused on my dad man. I was focused on tryin' to save his life man.... I don't know who the hell. It coulda been [Rodriguez]." Later during the interview, he said, "But I wasn't—I was right there with my dad, you know? I was just like, you know tryin' to wake him up ...." Defendant said, "I was at the corner on my knees right there where my dad was at." Defendant described actions with regard to Duenas: "Man I was cryin' right there with my dad man," "squeezin' [Duenas] like this man," "[c]ryin' man," "[t]ryin' to wake him up man."

Defendant's description of his reaction to Duenas's shooting is contradicted by the evidence. As discussed, Lucas saw two men run from the scene but did not see anyone else. In addition, photographs of defendant that evening show no blood on his clothing, which one would expect to see if defendant knelt next to Duenas and squeezed him while trying to save and wake him up. Furthermore, if defendant had held Duenas and tried to wake him up, then defendant would have seen the bullet wound in the back of Duenas's head and the exit wound in Duenas's cheek. Defendant's question to the detective as to where Duenas had been shot is inconsistent with defendant's claims that he grabbed Duenas and tried to save his life.

The jury may infer a consciousness of guilt from a defendant's lies to police. (*People v. Dykes* (1961) 198 Cal.App.2d 75, 80.) When manifestly and deliberately false statements are made about matters within the defendant's own knowledge and which relate materially to the issue of his guilt or innocence, "[s]uch falsifications cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances, and thus are admissions of guilt." (*People v. Osslo* (1958) 50 Cal.2d 75, 93.) In this matter, defendant lied to the detectives about his location during the shooting, whether he saw the shooter, his efforts to save Duenas, and whether he could use his cell phone to make calls. In an interview with police, defendant claimed that he concealed Rodriguez's identity and presence during the shooting because he did not know whether Rodriguez was responsible. But the reasonable response would have been to identify Rodriguez as a potential witness if defendant did not believe Rodriguez was responsible. Given the relationship between a father and son, a jury could have found it unreasonable that defendant would lie to police and conceal Duenas's killer based only upon his companionship with Rodriguez. The jury could have found it more reasonable to believe that defendant only lied to the police concerning the death of his father because defendant was involved in shooting Reese and Duenas and lied to protect himself.

The prosecutor also introduced evidence that after being arrested for the murders of Reese and Duenas on December 21, 2014, defendant escaped while being transported to jail. Defendant ran through the streets of Fresno while handcuffed and wearing jail attire and hid in a flower bed to avoid detection. The jury could have reasonably believed that defendant's escape and flight after arrest also evidenced consciousness of guilt. "[I]t is also probable that only one who expects his guilt to be proved at trial will attempt an escape and that an innocent man will stay for trial in order to clear his name and win lawful liberty." (*People v. Terry* (1970) 2 Cal.3d 362, 395, abrogated on other grounds as stated in *People v. Carpenter* (1997) 15 Cal.4th, 312, 382.)

Defendant argues that, at most, the evidence only showed that he was present and knew a crime was being committed and no witness testified that he followed Rodriguez and provided backup to the shooting. Relying upon *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, defendant argues that his mere presence is not sufficient to prove aiding and abetting murder. In that case, the federal court concluded the evidence was insufficient to support the defendant's conviction of first degree murder as an aider and abettor because it did not show that he knew his brother planned to kill, nor that he "acted in a way intended to encourage or facilitate these killings." (*Id.* at p. 1277.) The 15-year-old defendant was present when his brother shot one of the victims but "did not do or say anything before, during or after the shootings from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murder of [one victim] and the attempted murder of [the other victim]." (*Id.* at pp. 1266, 1278–1279.)

However, unlike *Juan H. v. Allen*, defendant did say and do something that evidenced his involvement in the shooting. Although no direct evidence demonstrates that defendant instigated the murders before the shootings, as we have discussed, substantial evidence encompasses circumstantial evidence and any reasonable inferences to be drawn from such evidence (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069–1070, abrogated on other grounds as stated in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216). " '[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred.' " (*People v. Edwards* (1992) 8 Cal.App.4th 1092,

1099.) Defendant's question, "[D]id you get him?" is sufficient to support the inference that defendant both knew of and participated in Rodriguez's shooting of Reese, and defendant's question reflects his encouragement of Rodriguez's actions while the murder was still happening.

An aider and abettor need not have instigated or advised the commission of the offense if the evidence demonstrates that defendant was " 'present for the purpose of assisting in its commission.' " (*People v. Francis* (1969) 71 Cal.2d 66, 72, overruled on other grounds as explained in *People v. Murphy* (2007) 154 Cal.App.4th 979, 983–984.) " '[T]he test [for an aider and abettor] is whether the accused in any way, directly or indirectly, aided the perpetrator by acts or encouraged him by words or gestures.' " (*Ibid.*) Defendant's words provided such encouragement as well as evidenced his involvement in the shooting itself. The crime of murder is not complete until the victim dies, and "a person may aid and abet a murder after the fatal blow is struck as long as the aiding and abetting occurs before the victim dies." (*People v. Celis* (2006) 141 Cal.App.4th 466, 474; see *id.* at p. 471 ["Because the victim's death is a sine qua non of murder, the crime could not have been 'completed' until [the victim] had died. '[A] murder ends with the death of the victim.' "], quoting *People v. Esquivel*, (1994) 28 Cal.App.4th 1386, 1397].)

The jury could have inferred from defendant's words, conduct, and relationship with Rodriguez that defendant's presence on the corner provided encouragement and backup to Rodriguez and Duenas and was intended to deter Reese from resistance. (See *People v. Moore* (1953) 120 Cal.App.2d 303, 306–307 [an aider and abettor need not commit an overt act during the crime where his presence is intended to provide encouragement to his companions, act as a lookout, or act as a deterrent to any continued resistance on the part of the victim].)

Substantial evidence demonstrates that Reese left his house to purchase a drink for dinner and encountered defendant, Duenas, and Rodriguez as he returned home. The parties confronted each other. The jury could have concluded the broken glass near Duenas's truck was evidence of a physical confrontation and that Reese's drink purchase ended up broken on the sidewalk. Defendant's statements to the detectives are evidence that Duenas confronted Reese on the corner where he was killed. The prosecution offered evidence of robbery as a possible motive, as proven by defendant's admission that he and Rodriguez intended to commit robbery that evening and defendant's text messages earlier in the day.[16] However, based on the entirety of the evidence, other jurors could also have reasonably inferred that Rodriguez, Duenas, and defendant provoked or were provoked by Reese and Duenas attacked Reese using a tire jack handle. That Rodriguez and defendant were also present on the corner supported an inference that they participated in the attack and Rodriguez shot at Reese to prevent harm to Duenas. GSR evidence on defendant's hands is evidence that defendant either handled the gun before the shooting or stood near Rodriguez during the shooting. His question after the shooting, "[D]id you get him?" is sufficient to support the inference that defendant joined in Rodriguez's intent to shoot or kill Reese, and then defendant left the scene to dispose of the firearm, protect Rodriguez, and

---

[16] While the jury acquitted defendant of felony murder based upon his participation in a conspiracy to rob Reese, some jurors may have considered robbery as a motive for the Reese's murder. When reviewing a conviction for substantial evidence, we assess " 'whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' " (*People v. Palmer* (2001) 24 Cal.4th 856, 863, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.)

conceal his own participation in the shooting. A jury could have reasonably inferred that Rodriguez would not render aid to Duenas unless he was assisting defendant, who had the closer relationship with Duenas and would have assisted Duenas in the attack on Reese.

Defendant argues that the question, "[D]id you get him?" could have been blurted by him in a state of shock. However, the existence of "possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence," could not justify this court's rejecting the jury's determination that defendant is guilty unless there is no substantial evidence to support the conviction under any hypothesis. (*People v. Redrick* (1961) 55 Cal.2d 282, 290.) Even if the evidence of defendant's guilt was not wholly persuasive, in reviewing the evidence in a light most favorable to the prosecution, we conclude the record contains substantial evidence from which the jury could have found beyond a reasonable doubt that defendant aided and abetted Rodriguez in the murders of Reese and Duenas.

Duenas, 2022 WL 5434451, at *14–20 (footnotes in original).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319).

"'After AEDPA, we apply the standards of Jackson with an additional layer of deference' to state court findings." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011) (alteration omitted) (quoting Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005)). As the Supreme Court has stated,

Jackson . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees

1    with the state court. The federal court instead may do so only if the state court

2    decision was "objectively unreasonable."

3    Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (quoting Renico v. Lett, 559 U.S. 766, 773

4    (2010)).

5         Petitioner argues that "[n]o evidence was presented that a pre shooting plan existed to rob

6    or shoot anyone on that evening," "Rodriguez independently decided to shoot the handgun

7    thereby killing Reese and [Petitioner]'s father," and Petitioner "was not present to aid or abet

8    Rodriguez." (ECF No. 13 at 5.) However, "[c]ircumstantial evidence and inferences drawn from

9    it may be sufficient to sustain a conviction." Ngo, 651 F.3d at 1114 (internal quotation marks

10   omitted) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). As noted by the

11   California Court of Appeals, viewing the evidence and the inferences to be drawn from it in the

12   light most favorable to the prosecution, the "jury could have inferred from [Petitioner]'s words,[17]

13   conduct,[18] and relationship with Rodriguez[19] that [Petitioner]'s presence on the corner[20] provided

14   encouragement and backup to Rodriguez and Duenas and was intended to deter Reese from

15   resistance." Duenas, 2022 WL 5434451, at *19 (footnotes added). "The jury in this case was

16   [17] A jury reasonably could have inferred from the question "[D]id you get him?" that Petitioner "was aware that
     Rodriguez intended to shoot Reese because he neither expressed surprise or disapproval of the shooting." Duenas,
17   2022 WL 5434451, at *16. "The question, '[D]id you get him?' also expresses a shared intent and interest in the
     outcome as well as encouragement in the result to 'get him.'" Id. "Furthermore, Rodriguez's response of, '[Y]eah,
18   let's go,' also evidences a concert of action between the two men." Id.
     [18] "In this matter, defendant lied to the detectives about his location during the shooting, whether he saw the shooter,
19   his efforts to save Duenas, and whether he could use his cell phone to make calls." Duenas, 2022 WL 5434451, at
     *18. "Given the relationship between a father and son, a jury could have found it unreasonable that defendant would
20   lie to police and conceal Duenas's killer based only upon his companionship with Rodriguez. The jury could have
     found it more reasonable to believe that defendant lied to the police concerning the death of his father because
21   defendant was involved in shooting Reese and Duenas and lied to protect himself." Id. "The jury could have
     reasonably believed that [Petitioner]'s escape and flight after arrest also evidenced consciousness of guilt." Id.
22   [19] Petitioner "admitted that he did intend to commit robbery as described in the text messages identified by the
     detective. He also admitted that he had named Rodriguez as the individual to accompany him during those crimes in
23   the text messages." Duenas, 2022 WL 5434451, at *17. Petitioner "told detectives that he and Rodriguez were
     leaving for that purpose when Reese walked by them. While [Petitioner] claimed that they were not attempting to
24   rob Reese, the jury could reasonably have inferred that [Petitioner] lied about Rodriguez's presence during the first
     interview to hide Rodriguez's involvement in the murders, which would also implicate [Petitioner] given their intent
25   to commit robbery." Id.
     [20] "The evidence supports a conclusion that [Petitioner] was at the corner during the shooting and not down the
26   street near his truck as he claimed to detectives. [Petitioner]'s own initial statement establishes that he was at the
     corner when Duenas and Reese were shot." Duenas, 2022 WL 5434451, at *16. "The jury could reasonably have
27   inferred that, given the specificity of [Petitioner]'s description [during his first police interview], he did see Reese
     run and fall to the ground after the shooting." Id. Witnesses "described these events as happening seconds after the
28   shooting. [Petitioner] would not have had time to run from his truck, down the street, and to the corner to observe
     Reese gasping for air and falling to the ground." Id.

1    convinced, and the only question under <u>Jackson</u> is whether that finding was so insupportable as

2    to fall below the threshold of bare rationality." <u>Coleman</u>, 566 U.S. at 656.

3        Petitioner also argues that it was the jury's duty to acquit because the circumstantial

4    evidence was susceptible to two reasonable interpretations, one suggesting guilt and the other

5    innocence. (ECF No. 13 at 5.) However, a reviewing state court "faced with a record of historical

6    facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such

7    conflicts in favor of the prosecution, and must defer to that resolution," <u>Jackson</u>, 443 U.S. at 326,

8    "and that [state court] determination in turn is entitled to considerable deference under AEDPA,"

9    <u>Coleman</u>, 566 U.S. at 656.

10        The Supreme Court has "made clear that <u>Jackson</u> claims face a high bar in federal habeas

11    proceedings because they are subject to two layers of judicial deference." <u>Coleman</u>, 566 U.S. at

12    651. "When the deference to state court decisions required by § 2254(d) is applied to the state

13    court's already deferential review," <u>Cavazos</u>, 565 U.S. at 7, the Court finds that the state court's

14    decision denying Petitioner's sufficiency of evidence claims was not contrary to, or an

15    unreasonable application of, clearly established federal law, nor was it based on an unreasonable

16    determination of fact. The decision was not "so lacking in justification that there was an error

17    well understood and comprehended in existing law beyond any possibility for fairminded

18    disagreement." <u>Richter</u>, 562 U.S. at 103. Petitioner has not demonstrated that "no 'fairminded

19    juris[t]' could have reached the same judgment as the state court." <u>Shinn v. Ramirez</u>, 596 U.S.

20    366, 378 (2022) (alteration in original) (quoting <u>Harrington</u>, 562 U.S. at 102). Accordingly,

21    Petitioner is not entitled to habeas relief on his sufficiency of the evidence claim, and the petition

22    should be denied.

23                                      **V.**

24                              **RECOMMENDATION**

25        Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of

26    habeas corpus be DENIED.

27        This Findings and Recommendation is submitted to the assigned United States District

28    Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the Court, **limited to fifteen (15) pages in length, including any exhibits**. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 6, 2025**

STANLEY A. BOONE
United States Magistrate Judge